## DRY ICE CORPORATION OF AMERICA et al. v. LOUISIANA DRY ICE CORPORATION et al.

### No. 370.

District Court, W. D. Louisiana, Shreveport Division.

Oct. 31, 1930.

Prowell, McBride & Ray, of New Orleans (W. W. Lesselbaum, of New York City, of counsel), for complainants.

Robert A. Hunter and Richard H. Switzer, both of Shreveport, La., and James E. Anderson, of Amarillo, Tex., for respondents.

### DAWKINS, District Judge.

Plaintiffs allege that they are the holders of duly registered and lawful trade-marks and a trade-name embracing the words "Dry Ice," when used in connection with their business of manufacturing and dealing in solid carbon dioxide as a refrigerant. They seek to enjoin the use of these words in the corporate title of the defendant corporation, as well as to restrain it and the other defendants from using them in advertising or selling any of their products intended for the same purpose. A temporary restraining order was issued, and on hearing a preliminary injunction was granted.

Defendants first attack the corporate capacity of the complainant, Dry Ice Corporation of America, on the ground that it had not complied with the laws of the state of Delaware, under which it attempted to incorporate. However, without finding it necessary to go into the great mass of evidence on the point, I think it sufficient to say that this complainant has shown a reasonable compliance with the statutes of that state, at least enough to give it a proper standing in court to prosecute this cause. It was given a certificate of incorporation by the Secretary of State, which I find to have been recorded as required by the laws of Delaware, and the other questions raised I think involve issues which can be urged by the state or stockholders only for whose benefit these provisions were incorporated in the law, and are not available in defense of this suit.

The defense otherwise set up in the answer is twofold, first, that the term "dry ice" is generic and descriptive of the commodity, solid carbon dioxide, and hence no exclusive right to use the same could be acquired through its registration as a trade-mark, or otherwise; and, second, that complainants have lost any claim thereto by laches. They also deny that they have in any sense copied or imitated the symbol or design of the alleged trade-marks, but aver that they have used the term in their corporate title as descriptive of the business in which they were about to engage, to wit, the manufacture and sale of solid carbon dioxide. They say also that their process is different from that of complainants, in that they propose to manufacture solid carbon dioxide from natural gas.

I find the pertinent facts to be substantially as follows:

The predecessor of the Dry Ice Corporation of America was the Pressed Air Corporation, which was organized in 1922, and at first was engaged in the manufacture of automotive machines, but gradually drifted into the making of solid carbon dioxide for use as a refrigerant. Much experimentation was done along this line, and eventually certain containers and equipment were evolved and patented by some of the complainant's employees, the main feature of which was to place the solid carbon dioxide in the center, with the food or other merchandise to be refrigerated around it, the walls and sides of the containers serving to hold the vapor or gas resulting from the sublimation or evaporation of the carbon dioxide; the space occupied by the food or other substance was thus kept cold for a much longer period than could be done with ordinary ice. Only a fraction of the refrigerant, as compared to ice, was required, and, in addition, there was an absence of moisture, and no necessity for using such a corrosive as salt. The result was that the same quantity of merchandise could be packed, preserved, and shipped over great distances in packages about one-fourth the usual weight. This worked a great sav-

ing in freight and express charges. The containers were made of cheap material which could be discarded after reaching destination, thereby saving the further expense of having them returned to the shipper.

The Pressed Air Corporation became the pioneer in this method of refrigeration, and at first called its product "pressed air ice." However, this name was not satisfactory, and, after numerous suggestions from those connected with the company, the term "dry ice" was, on or about the 1st of January, 1925, selected as a name which has since been continuously used to designate the product. Thereafter trade-marks covering the use of said words were registered in the Patent Office, as follows:

"Trade Mark No. 200,934 issued July 14, 1925, as the trade-mark of the Dry Ice Corporation of America for carbon dioxide ($CO_2$) in solidified forms, mixtures and compounds, in class 6, Chemicals, Medicines and Pharmaceutical Preparations.

"Trade Mark No. 215,799, issued July 27, 1926, as the trade-mark of the Dry Ice Corporation of America for refrigerators, in Class 31, Filters and Refrigerators.

"Trade Mark No. 230,202, issued July 19, 1927, for empty containers adapted for storage, transportation or use of carbon dioxide ($CO_2$) in solidified forms, mixtures, and compounds in Class 2, receptacles."

In the case of the second trade-mark, a disclaimer was required as to the word "ice" as being descriptive for refrigerants, except when used in combination with the word "dry."

In 1927 the Dry Ice Corporation of America was organized, and all the rights of the Pressed Air Corporation were subsequently conveyed to it through the medium of an individual, according to the laws of Delaware. The first plant for the manufacture of the refrigerant in commercial quantities was established at Maspeth, L. I., in 1924, the second at Long Island City in the early part of 1925, and the third at Yonkers, N. Y., early in 1926. Since that time plants and warehouses have been established at the following places: Plants at Cambridge, Mass.; Atlanta, Ga.; Niagara Falls, Buffalo, and New York City, N. Y.; Chicago, Ill.; Cincinnati, Ohio; Jacksonville, Fla.; Kansas City, Mo.; Minneapolis, Minn.; Maspeth, L. I.; Elizabeth, N. J.; Yonkers, N. Y.; Philadelphia and Pittsburg, Pa.; Albany, N. Y.; St. Louis, Mo.; Denver, Colo. Warehouses at Cleveland, Ohio; New York City; Philadelphia and Pittsburg, Pa.; Detroit, Mich.; Baltimore, Md.; New Haven, Conn.; and Memphis, Tenn.

The quantities sold during the years 1925 to 1929, both inclusive, were as follows: In 1925, 269,801 pounds; in 1926, 1,093,840 pounds; in 1927, 3,412,031 pounds; in 1928, 9,959,518 pounds; in 1929, 27,376,006 pounds.

The revenue therefrom over the same period increased from $13,490.00 in 1925 to $1,324,124 in 1929, and the product is now shipped generally throughout the United States except to the territory "around the Rocky Mountains." On the 19th day of April, 1929, the Dry Ice Corporation of America granted to the Dry Cold Corporation of Texas-Louisiana a license to manufacture and sell the product in those states, and plants have been established at New Orleans and Fort Worth, Tex., which have a rapidly growing business. Over $27,000 has been spent in advertising and more than $500,000 in experimental and development work. At the time of the trial, further construction and enlargement of facilities were being made as follows:

"At present constructing new plants in Los Angeles, California and Seattle, Washington, Peoria, Ill. and establishing new warehouses in San Francisco and Harrisburg; also increasing manufacturing facilities at the Niagara Falls plant, the Elizabeth plant, Chicago, Maspeth, L. I., Atlanta, Ga., Chicago, Ill. A new plant will be erected at Cleveland, Ohio, and practically all plants are being furnished with additional equipment to increase the present capacity of those plants, and $25,000.00 is being spent during the present year for advertising."

The product of the complainants has become known to the public in the states of Louisiana and Texas, which will be served by the plants of the Dry Cold Corporation of Texas-Louisiana, licensee, as "dry ice," and, although its business is quite young, having been established during the summer of 1929, when this suit was filed, as before stated, was growing rapidly. The principal lines in which it has been used are the ice cream trade, shipping of food products, meats, etc. The trucks and other vehicles in which it is used are also equipped with the patented facilities of the plaintiffs. The trade-marks have been registered in nearly all of the states of the Union, and advertising matter has been widely distributed throughout the country with the view of building up a trade over the whole of the United States.

Labels bearing the design of the trade-mark, embracing the words "Dry Ice," are provided and attached to the product and equipment as it is sold and distributed from the various plants, warehouses, etc., of the company itself, as well as by the licensees. So that, at the time of the acts on the part of defendants complained of in this suit, the trade-name and trade-marks embracing the words "Dry Ice," as used by the plaintiffs, had become fairly well known to those engaged in business for which the refrigerant is used.

On the 26th day of October, 1929, certain citizens of Texas and Louisiana appeared before a notary public in the parish of Caddo, state of Louisiana, and signed articles of incorporation for the Louisiana Dry Ice Corporation, the objects and purposes of which are quoted in part as follows:

"Produce solid carbon dioxide (otherwise known as 'Quix Kold') for the isolation of inert gasses, done and obtained from the consumption and use of Natural gas, by methods and process commonly known and designated as Belt process, as a licensee of J. S. Belt Helium Interests, and to produce carbon dioxide gas for such purposes, with the ultimate results of producing what is sometimes familiarly and more recently known as Dry Ice, same being known and to be known to the public as 'Quix Kold.' "

The capital stock was fixed at one hundred and thirty thousand shares, "all of which shall have no nominal or par value"; but, for the purposes of fixing the liability of the subscribers, "it was to be treated as of the value of $5.00 per share." This charter was filed in the clerk's office on October 28, 1929, and duly recorded.

On November 23, 1929, J. S. Belt executed to and in favor of the Louisiana Dry Ice Corporation an agreement or assignment, in which it was recited that he controlled "certain methods and processes for the production of carbon dioxide gas and the production of solid carbon dioxide (otherwise known as 'Quix Kold') for the isolation of inert gases, done and obtained from the consumption and use of natural gas, which said methods and processes being now kept and retained as trade secrets or formulæ and upon the means, method and equipment of said method and processes patent applications are prosecuted in the Patent Office of the United States, etc.," and granting to said Louisiana Dry Ice Corporation the right to "use and employ said method or methods, process and processes and any and all machinery and equipment necessary and inci-

dent thereto within and for the state of Louisiana"; the said company being obligated to supply the funds for building and installing necessary machinery and equipment for making said "solid carbon dioxide (hereinafter referred to as 'Quix Kold')," to meet the demand within the state "as would be in keeping with efficient and competitive business." Other proper stipulations were included, among them being one for the payment of a royalty of 3½ per cent. of the gross proceeds arising from the business, and, in addition thereto, 5 per cent. of the gross sums expended for the "building and erection of plants and facilities to use, employ and operate said methods and processes within the state of Louisiana. * * * "

The Louisiana Dry Ice Corporation later applied to the securities commission of the state for authority to sell its stock and securities to the public, and on January 4, 1930, this suit was filed, seeking an injunction against use of the words "dry ice" in the corporate title or in any other manner in the business of manufacturing and selling solid carbon dioxide as a refrigerant.

As I see it, there are two questions of law involved in this case: First, may the words "dry ice," standing alone, be adopted as a technical trade-mark? and secondly, if not, has the complainant shown such a user thereof as to entitle it to protection in a secondary sense against unfair competition in the manufacture and sale of its product?

It is contended on behalf of complainants that the use of the term constitutes an arbitrary and novel combination of the words "dry" and "ice" in a manner amounting to a paradox, when used in connection with the popular, everyday conception of refrigeration with water ice, in that, when speaking of ice, everyone thinks of it as being a block of frozen water, which, necessarily, in the process of refrigeration, melts and produces moisture by the absorption of heat; also that in common appreciation ice means a transparent substance of glass-like appearance; whereas solid carbon dioxide is relatively dry, gives off little or no moisture in the process of subliming or evaporating, and is opaque. On the other hand, the defendants claim the words are both generic and descriptive—that is, dry is applicable to any and everything which is reasonably free from moisture, which is the condition of solid carbon dioxide, and ice means any liquid reduced to a solid by lowering its temperature, such as sleet, snow, hail, frost, etc., the appearance of which is dependent upon the

substance used as well as whether or not it contains anything other than clear water.

I am sure that both the words "dry" and "ice" when used separately are of general import, the one an adjective and the other a common noun. The first is relative as well scribe any object comparatively free from as descriptive, and is used ordinarily to demoisture, which, of course, to that extent describes the condition of solid carbon dioxide. When we hear the word "ice" we naturally think of an object of extreme cold or low temperature, and, on further reflection as to its qualities, that it will, when properly applied, produce a like condition in other objects or substances, either by placing it around or in the thing to be cooled. It is true that ordinarily we conceive it to be made from water, but give little thought to whether or not it is transparent or otherwise, this being a consideration dependent upon the sense in which it is used or the particular frozen liquid to which it is applied. The question of whether or not it melts or returns to the liquid state by the increase of temperature does not usually arise, unless we think of it in connection with some use or purpose to which it is put. So that one hearing the expression "dry ice" the first time would seem naturally to form a mental picture of a substance without moisture, having a temperature below the freezing point, and capable of performing the usual function of water ice. In a block of solid carbon dioxide we find all of these essential qualities, and the term "ice" is clearly descriptive in a general sense of the substance to which it is applied here. As early as September 30, 1897, this thought was entertained and expressed by Samuel Elworthy in his application for letters' patent as disclosed by certified copies thereof filed with the record in this case, wherein he refers to it (page 1, lines 40 to 49, inc.) as "carbonic acid snow," and can be compressed "into blocks, more or less solid, or by freezing the liquefied gas direct to a condition resembling ordinary ice"; in line 48 of page 2, it is referred to as "block of ice"; line 63, of same page, as "ice blocks"; in lines 78 to 79, as appearing "either in the form of snow or broken ice"; and in lines 81 to 82 and 83 he states it "is valuable for nearly all purposes for which ice is now used." Hence the idea that solid carbon dioxide has the appearance of ice and had been referred to and described as such was available to the general public more than thirty years ago.

■ My conclusion is that the words were not susceptible of registry as a technical trade-mark, standing alone and unaccompanied by any distinctive design. Section 85, of title 15, U. S. Code (15 USCA § 85), provides:

"No mark by which the goods of the owner of the mark may be distinguished from other goods of the same class shall be refused registration as a trade-mark on account of the nature of such mark unless such mark—

"(a) Consists of or compromises immoral or scandalous matter.

"(b) Consists of or compromises the flag or coat of arms or other insignia of the United States or any simulation thereof, or of any State or municipality or of any foreign nation, or of any design or picture that has been or may hereafter be adopted by any fraternal society as its emblem, or of any name, distinguishing mark, character, emblem, colors, flag, or banner adopted by any institution, organization, club, or society which was incorporated in any State in the United States prior to the date of the adoption and use by the applicant: Provided, that said name, distinguishing mark, character, emblem, colors, flag, or banner was adopted and publicly used by said institution, organization, club, or society prior to the date of adoption and use by the applicant: Provided, That trade-marks which are identical with a registered or known trade-mark owned and in use by another and appropriated to merchandise of the same descriptive properties, or which so nearly resemble a registered or known trade-mark owned and in use by another and appropriated to merchandise of the same descriptive properties as to be likely to cause confusion or mistake in the mind of the public or to deceive purchasers shall not be registered: Provided, That no mark which consists merely in the name of an individual, firm, corporation, or association not written, printed, impressed, or woven in some particular or distinctive manner, or in association with a portrait of the individual, *or merely in words or devices which are descriptive of the goods with which they are used, or of the character or quality of such goods,* or merely a geographical name or term, shall be registered under the terms of this subdivision of this chapter." (Italics by the writer of this opinion.)

■ The mere fact that the mark proposed as a trade-symbol contains words descriptive of the nature of the goods to which it is to be applied does not prevent registration under this act, if it consists of an arbitrary and fanciful design in combination with such

words so that the whole comprises a brand to reasonably distinguish the goods of the registrant, and is accompanied by a proper declaration disclaiming any exclusive right to the descriptive words. Estate of P. D. Beckwith, Inc., v. Commissioner of Patents, 252 U. S. 538, 40 S. Ct. 414, 64 L. Ed. 705, and authorities therein cited. The statute above quoted made no substantial change in the law of trade-marks which had existed long prior to its adoption. The basic reason for the rule is that a trade-mark, in the mind of the public, by long usage, eventually takes the place of the name of the dealer, and his product becomes known and is distinguishable thereby. At the same time other persons, in so far as the descriptive words are concerned, are left free to use them as long as it is done without imitating the design of the original appropriator or in such manner as is not reasonably calculated to deceive those who have dealt with, or intend to deal with, him into believing that the goods of the second comer are his.

There is no contention in this case that the defendants have the right to use either the exact design of complainant or anything resembling it, although some of their printed matter was printed with the same kind of type; in fact, they have not as yet begun the manufacture or sale of their product, but were in the process of organization at the time this suit was filed. The situation is that plaintiff simply asserts an exclusive right to use the words "dry ice" in any manner or form when applied to refrigeration. For the reasons heretofore given, I am of the opinion that this position cannot be sustained. Richmond Remedies Co. v. Dr. Miles Medicine Co. (C. C. A.) 16 F.(2d) 598.

██ Having found that the complainant is not entitled to the exclusive use of these words in a primary sense, we now come to the question of whether or not "dry ice" has acquired a secondary meaning in connection with its business, such as to entitle it to protection against unfair competition on the part of defendants cr others who may use the term for the same purpose. That ordinary words, whether descriptive or not, may, by usage, become so identified with the business or product of a dealer as to constitute a property right for the preservation of which a court of equity will interfere, is well settled, and in fact conceded in this case. See 38 Cyc. p. 769, verbo Trade-Marks, Trade Names and Unfair Competition, as well as authorities cited in footnotes. The rule is also applicable to names of a generic class. Id. p. 771. I think the facts hereinabove re-

cited showing the extent to which complainant had used the words to identify its product disclose a condition entitling it to injunctive relief against any action of defendants which is reasonably calculated to deceive the public in these communities where it is doing business. In the state of Louisiana, within the short period of six months before this suit was filed its licensee, the Dry Cold Corporation of Louisiana-Texas had built up a substantial trade, and the evidence shows that the product known as "dry ice" has come to be recognized as that of plaintiff; and, if and when the defendant, Louisiana Dry Ice Corporation, begins to manufacture solid carbon dioxide, it is permitted to market it as "dry ice," there is reasonable probability that it will become confused with the plaintiff's merchandise, and much of the business which defendant has built up may be lost to it. It is also shown that the defendants and their licensor, J. S. Belt, have made unauthorized uses of articles upon the subject of solid carbon dioxide referred to therein as the dry ice manufactured by plaintiff, which were prepared by persons in the employ of the latter, and have likewise referred to it as such in their literature used in connection with their organization, the whole import and tendency of which indicates that, but for the bringing of this suit, they would have proceeded when ready for business to sell their product as dry ice. It is stated now, however, that they do not intend to use the words on the packages or containers, but, instead,. will call it "Quix Kold." In such circumstances, I think the court is justified in finding what was intended rather than to accept present assertions. The plaintiff does not have to wait until the damage to its trade has actually been done. It is sufficient if the evidence discloses a reasonable probability that injury will result if the defendant is allowed to proceed.

As to the use of the words "dry ice" in the corporate name of defendant: It is true that the Dry Cold Corporation of Louisiana-Texas is the licensee of complainant, Dry Ice Corporation of America, in this state, and the latter will not directly manufacture and distribute its products. However, it appears that the former not only manufactures and sells the carbon dioxide under the latter's trade-name of "dry ice," but also handles, under its license, all of the patented containers and other facilities which the Dry Ice Corporation of America and its associated companies, coplaintiffs herein, have provided for the business with the fullest display

thereof of the trade-name in the form of labels, impressions, and designs, such as to identify the same with the plaintiff companies. It is shown by the evidence, as well as reasonable to assume, that under this state of the trade the public has come to associate the words "dry ice" with the business of plaintiff under the principal words of its name "Dry Ice Corporation," and little attention will be paid to the final phrase "of America." The defendant company's name is identical, except that instead of the last two words it uses "Louisiana" as the first word of its name. If it should establish factories or warehouses in this state or Texas in territory served by plaintiff's licensee, in view of the rapidly growing business of the latter, both the name and product being identical with that of complainant, but for the small difference mentioned, the trade could easily be confused and deceived into using the defendant's product for that of plaintiffs. If it may use the words in its title, then it would have the right to place the same upon the buildings and in its advertising matter. If these places of business were more conveniently located to plaintiff's customers, and they were by the use of the words "dry ice" merely induced to go to defendants for their needs, believing it was the product of plaintiffs, then the damage would be just as real as if they had been led to do so by actual misrepresentation.

The defendants evidently believed there was some value in the use of the words in connection with their business, otherwise they would have adopted a different name, especially one not calculated to produce confusion with that of plaintiff. They or their assignor, J. S. Belt, knew both of plaintiff's corporate title and the fact that it had for some years manufactured and sold its product under the name of dry ice. Some of the other individual defendants, being the ones most active in the organization and promotion of the Louisiana Dry Ice Corporation, when approached by a representative of plaintiff, who did not disclose that relationship, referred to Mr. Belt as the man most able to give information about the defendant's business. Belt furnished, in part at least, the data disclosed in the articles prepared by employees of plaintiff and published without their knowledge or consent in a periodical in the city of Amarillo, Tex., where he had operated. I am satisfied that he, with this knowledge, suggested the name of the defendant company, for the other defendants appeared to know little or nothing about either the technical or practical phas-

es of the business in which the new company was to engage.

My conclusion is that defendants, by the use of the words "dry ice" in the corporate name, intended to reap some of the benefits of the plaintiff's good will, resulting from its expenditures in educating the public to the use of its product under that name. To permit them to do this without some affirmative declaration to distinguish the defendant corporation and the refrigerant which it will manufacture from that of plaintiff would accomplish the desired end. The defendants will therefore be enjoined from using the words "dry ice," either alone or in combination in the corporate name, on solid carbon dioxide, or in advertisements, unless accompanied by information that the defendant is not the original Dry Ice Corporation, its successor or licensee. Herring-Hall Marvin Safe Company v. Hall's Safe Company, 208 U. S. 554, 28 S. Ct. 350, 52 L. Ed. 616.

With regard to the plea of laches, the evidence shows that the complainant has been reasonably diligent in protecting the use of its trade-name, "Dry Ice," and hence the contention is without merit. Proper decree may be presented.